**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------x
| | :: |
LOCKTON PARTNERS, LLC, | :: |
| :: |
              Plaintiff, | :: | Misc. Action No. 25-mc-00102
| :: |
   -against- | :: |
| :: |
STONE POINT CAPITAL LLC, | :: |
| :: |
             Defendant. | :: |
| :: |
-----------------------------------------------------------x

_____

### PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO COMPEL

_____

GIBSON, DUNN & CRUTCHER LLP
Lauren Goldman
200 Park Avenue
New York, NY 10166-0193
Telephone:  (212) 351-4000
LGoldman@gibsondunn.com

Russell H. Falconer (*pro hac vice forthcoming*)
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
Telephone:  (214) 698-3170
Email:  RFalconer@gibsondunn.com

RILEY SAFER HOMES & CANCILA
Eli Litoff (*pro hac vice forthcoming*)
One South Dearborn St., Suite 2200
Chicago, IL 60603
Telephone: (312) 471-8780
elitoff@rshc-law.com

*Attorneys for Plaintiff Lockton Partners, LLC*

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 3

   I.    Alliant's Raid of Lockton................................................................................ 3

   II.   Alliant's National Strategy of Unfair Competition: The Leveraged Hire Strategy............. 6

   III.  Stone Point's Relationship to Alliant and Involvement in the Leveraged Hire Strategy. 8

   IV.  Lockton's Subpoena and Stone Point's Response. ......................................... 9

LEGAL STANDARD ....................................................................................................... 12

ARGUMENT ................................................................................................................... 12

   I.    The Court Should Compel Production of Documents Related to the Leveraged Hire Strategy. ......................................................................................................... 12

      A.   Documents Related to Alliant's Leveraged Hire Strategy Are Relevant. ..................... 12

      B.   Any Burden Imposed on Stone Point is Proportional to the Needs of the Case. .......... 15

   II.   The Court Should Compel Stone Point to Produce Documents Related to Lockton's Confidential Information.......................................................................................... 19

   III.  The Court Should Order Stone Point to Produce a Complete Privilege Log.................. 20

CONCLUSION ................................................................................................................. 21

## TABLE OF AUTHORITIES

### Cases

*In re Chevron Corp.*,
    749 F. Supp. 2d 170 (S.D.N.Y. 2010)..................................................................20

*Daval Steel Prods, a Div. of Francosteel Corp. v. M/V Fakredine*,
    951 F.2d 1357 (2d Cir. 1991)........................................................................12

*During v. City Univ. of New York*,
    2006 WL 2192843 (S.D.N.Y. Aug. 1, 2006)...........................................12

*Frazier v. Morgan Stanley & Co., LLC*,
    2021 WL 2709250 (S.D.N.Y. July 1, 2021)............................................17

*Hamilton Partners, L.P. v. Highland Cap. Mgmt., L.P.*,
    2016 WL 612233 (Del. Ch. Feb. 2, 2016) ..............................................18

*Kasper v. AAC Holdings, Inc.*,
    2017 WL 6353294 (M.D. Tenn. Oct. 6, 2017) ......................................18

*Mackey v. Mackey*,
    914 S.W.2d 48 (Mo. Ct. App. 1996)......................................................14

*MG Freesites Ltd. v. Scorpcast, LLC*,
    2023 WL 2822272 (S.D.N.Y. Apr. 7, 2023)..........................................18

*Mountain W. Series of Lockton Cos., LLC v. Alliant Ins. Servs.*,
    No. 2019-0226-JTL, 2019 WL 2536104 (Del. Ch. 2020) (unpublished)
    .....................................................................................7, 8, 13, 14, 19, 21

*Saller v. QVC, Inc.*,
    2016 WL 8716270 (E.D. Pa. June 24, 2016) .........................................18

*In re: Subpoena to Stone Point Capital, LLC*,
    No. FSTCV226055961S, 2022 WL 3754816 (Conn. Super. Ct. Aug. 30,
    2022) (unpublished).........................................................................14, 15

### Rules

Fed. R. Civ. P. 26(b)(1)..........................................................................12

Fed. R. Civ. P. 45(e)(2)(A) .....................................................................20

## INTRODUCTION

Plaintiff Lockton Partners, LLC's ("Lockton") subpoena to Stone Point Capital LLC ("Stone Point") seeks plainly relevant information that is critically important to Lockton's claims in *Lockton Companies, LLC et al. v. Alliant Insurance Services, Inc., et al.* Case No. 23-cv-00705-SRB (W.D. Mo.) ("the Missouri Action"). Lockton is an insurance brokerage. Stone Point is a private equity firm. The lead defendant in the Missouri Action is Alliant Insurance Services, Inc. ("Alliant"), one of Stone Point's portfolio companies and a competitor of Lockton's. Lockton filed the Missouri Action against Alliant and six former Lockton producers because Lockton is the latest victim of Alliant's "leveraged hire strategy," an unlawful strategy that Alliant employs throughout the country to steal customers, confidential information, and personnel from other brokerages. Stone Point designed the leveraged hire strategy and helps Alliant implement it. Stone Point has no legitimate grounds to refuse to produce documents in response to Lockton's subpoena.

Alliant uses the leveraged hire strategy to poach producers away from competitors. (Producers are insurance-brokerage professionals who originate business for brokers like Lockton and Alliant.) Alliant induces producers to leave their current brokerage and join Alliant by offering them outsized, above-market compensation packages, with bonuses, equity awards, and other incentives expressly made contingent on the producers originating a certain amount of business for Alliant. That strategy is not profitable unless the producers solicit their clients at their former brokerage firms to move their business. But most producers (including all six of the individual defendants in the Missouri Action) are subject to legally binding non-solicitation covenants. Alliant knows that. Stone Point knows it, too. But they do not care. They *want* the producers who join Alliant to violate those covenants and solicit their former clients—indeed, the leveraged hire strategy depends upon this improper solicitation.

The leveraged hire strategy is at the heart of Lockton's claims in the Missouri Action. Pursuant to that strategy, Alliant induced six former Lockton producers (and more than a dozen former Lockton employees) to breach their contractual promises and violate their fiduciary obligations to Lockton. At Alliant's direction, these individuals coordinated a mass resignation from Lockton, without notice, taking Lockton's customers and confidential information with them to Alliant. This "raid" of Lockton followed a consistent pattern of similar conduct executed against Alliant's competitors across the country pursuant to the leveraged hire strategy.

And Stone Point is directly involved with—and possesses documents related to—the leveraged hire strategy. Stone Point is Alliant's largest shareholder and an integral part of its management team. Stone Point helped develop and helps implement Alliant's leveraged hire strategy, and its significant investments in Alliant provide the finances Alliant needs to implement the leveraged hire strategy. Without Stone Point's financial backing, Alliant would not have the resources to weather the costs of the litigation that inevitably results from its unlawful raids. Nor could Alliant offer inflated compensation packages to induce producers to breach their contractual obligations when they join Alliant.

Given Stone Point's substantial, direct involvement in the conduct giving rise to Lockton's claims in the Missouri Action, Lockton issued a subpoena to Stone Point. As relevant here, the subpoena sought documents on two topics. ***First***, the subpoena seeks documents related to Alliant's leveraged hire strategy, including communications both internal to Stone Point and with Alliant regarding the strategy, financial analyses of the risks and profitability of this strategy, and plans to deploy the strategy against Lockton, including the hiring of the six former Lockton producers who are defendants in the Missouri Action and other former Lockton personnel. ***Second***, the subpoena seeks any documents in Stone Point's possession related to Lockton's confidential

information, which Alliant and Stone Point may have acquired or become aware of through their raids on Lockton.

These are critical documents that go to the heart of Lockton's claims against Alliant. Stone Point's analysis, approval, and funding of Alliant's financial inducements to producers is directly relevant to Lockton's claims for tortious interference, misappropriation of trade secrets, breach of fiduciary duties, and civil conspiracy. The documents bear directly on Alliant's motive, plan, modus operandi, pattern and practice, and absence of mistake, all of which will support the intent elements of Lockton's claims against Alliant.

Yet Stone Point has refused to comply with the subpoena. It has refused to even *search for*, let alone produce, any documents related to the leveraged hire strategy. It has refused to produce documents related to Lockton's confidential information. And it has refused to agree to provide a privilege log for all documents it withholds from its eventual production on the basis of privilege.

Stone Point's refusal to comply with the subpoena is improper and deprives Lockton of documents critical to its case. Stone Point's refusal is particularly unjustified given that Stone Point knows a court rejected Stone Point's arguments and compelled production of these very documents in a similar lawsuit brought against Alliant in 2022. This Court should order Stone Point to comply with Lockton's subpoena by promptly producing responsive documents and providing a complete privilege log.

## **BACKGROUND**

### I.    **Alliant's Raid of Lockton.**

Lockton is one of the world's preeminent insurance brokerage firms.[1] *See* Declaration of

---

[1] For purposes of this motion, Lockton provides a high-level summary of the extensive allegations in the Missouri Action. For additional details, Lockton's 208-paragraph complaint is attached as Exhibit A to the Declaration of Russell H. Falconer.

Russell H. Falconer ("Falconer Decl."), Ex. A, Third Amended Complaint, ECF No. 92, *Lockton Companies, LLC – Pacific Series, et. al. v. Alliant Insurance Services, Inc., et. al.*, Case No. 23-cv-00705 (W.D. Mo.) ("Compl."), ¶ 25. Lockton is also a recent and repeated victim of Alliant's "leveraged hire strategy," which is a euphemism for an unlawful scheme to "raid" competitors and steal personnel, customers, and confidential information. *See, e.g.*, *id.* ¶¶ 2, 7, 38, 96-114.

The raid at issue in the Missouri Action followed a precise pattern that Alliant has executed in dozens of jurisdictions across the country. *Id.* ¶ 118. First, Alliant identified Richard Roderick, one of Lockton's top producers who managed a multi-million-dollar book of business that Alliant wanted to poach. *Id.* ¶ 119. Over several months, Alliant and Roderick negotiated millions of dollars in signing bonuses and other compensation with the expectation that Roderick would violate his restrictive covenants and fiduciary duties by soliciting Lockton personnel and customers to join him at Alliant. *Id.* ¶¶ 61, 98, 119-20. On information and belief, Roderick agreed to join Alliant as early as April 2023, but continued to collect paychecks from Lockton for months while working with Alliant to plan its coordinated raid. *Id.* ¶¶ 6, 64-67. In the summer and fall of 2023, Roderick and Alliant worked together to recruit other Lockton producers Greg Barnes, Scott Canales, and Mark Racunas (collectively with Roderick, the "Initial Producer Defendants"), who all agreed to join Alliant. *Id.* ¶¶ 119-120; 122. Similar to Roderick, the other producers agreed to outsized compensation packages with the expectation that they would violate their restrictive covenants and fiduciary duties by soliciting colleagues and customers to leave Lockton for Alliant. *Id.* ¶¶ 98; 119.

In the summer and fall of 2023, the Initial Producer Defendants prepared for their coordinated departure by recruiting other Lockton personnel to join them at Alliant and by misappropriating Lockton's trade secrets and confidential information for Alliant's benefit. *Id.* ¶¶

120-123. For instance, Barnes emailed confidential information to his personal email address and then attempted to cover his tracks by deleting those emails from his Lockton email account. *Id.* ¶ 120. Meanwhile, Canales emailed his entire client list to his daughter's email address in mid-September 2023, under the guise of sending his holiday cards early (the same pretextual subterfuge employed by another former Lockton producer who left Lockton for Alliant). *Id.* For his part, Roderick instructed his executive assistant to print a hard copy of his entire client list in the months before he left Lockton, after he was already deep into discussions with Alliant and soliciting other Lockton producers to join him at Alliant. *Id.*

Once their preparation was complete, the raid peaked on October 3, 2023, a date Alliant and the Initial Producer Defendants chose because they knew Lockton leadership was away at their annual meetings. *Id.* ¶ 122. On that date, consistent with Alliant's leveraged hire strategy, the Initial Producer Defendants resigned "effective immediately." *Id.* Along with them, more than a half-dozen individuals with whom they worked closely at Lockton also abruptly resigned to join Alliant on the same day. *Id.* ¶ 123. Over the next several days, more than a half-dozen more Lockton personnel joined Alliant. *Id.* In conjunction with this mass resignation, dozens of customers—representing millions of dollars in annual revenue—informed Lockton that they were taking their business to Alliant. *Id.* ¶¶ 120, 126-130.

Phase two of Alliant's raid occurred in the spring of 2024, when producers James Lawrence and Andrew McClave (with Initial Producer Defendants, "Individual Defendants"), abruptly resigned to join Alliant. *Id.* ¶¶ 130-132. As before, these resignations followed Alliant's leveraged hire "playbook." Approximately nine of Lawrence and McClave's Lockton colleagues immediately followed them out the door, along with millions of dollars in customer business. *Id.* ¶ 124 n.13. All told, Alliant has obtained over 20 Lockton producers and employees, along with

more than $20 million in annual customer revenue as a result of its ongoing raid. *Id.* ¶¶ 120; 123; 124 n.13.

## II.    Alliant's National Strategy of Unfair Competition: The Leveraged Hire Strategy.

Alliant developed and began implementing its leveraged hire strategy in approximately 2015, when it received a large investment from Stone Point. *Id.* ¶ 96. The "leveraged hire strategy" is, in reality, a euphemism for an unlawful strategy to conduct "raids" of competitors across the country to steal trade secrets, confidential information, and customers. *Id.* ¶ 1. Lockton alleges that Alliant decided to employ this unlawful strategy because Alliant and Stone Point calculated that the amount of money, information, and receivables that Alliant could steal from its competitors would outweigh the litigation costs, including settlements and judgments, for doing so. *Id.* ¶ 97. As Alliant and Stone Point predicted, Alliant's continued raids have given rise to a mountain of litigation, and Alliant nonetheless continues to profit from the unlawful conduct. *See id.* ¶¶ 38 & n.7, 97, 111-12. The leveraged hire strategy is approved and implemented at the highest levels of Alliant's organization. Its Chief Operating Officer, Peter Carpenter, is responsible for directing and managing the strategy. *Id.* ¶ 114.

Alliant's raids follow the same basic pattern with minor variations. *Id.* ¶ 97. Alliant targets one or two producers from a competitor who are perceived as important to client relationships. *Id.* ¶ 98. Alliant knows these producers have entered into restrictive covenants with their current companies, but Alliant offers inflated compensation packages to induce violations of those covenants. *Id.* At Alliant's direction, these producers withhold notice of their decision to join Alliant and remain with Alliant's competitor for a period of months, working to gather trade secrets and confidential information, solicit colleagues, and solicit customers for Alliant's benefit. *Id.* at ¶¶ 99-102. Then, after months of planning, Alliant and the individuals coordinate a mass

resignation, often at a time when the competitor's management is unable to immediately respond. *Id.* ¶ 103. Alliant and the newly-hired personnel solicit the competitor's customers to transition business to Alliant. *Id.* ¶ 104. They then engage in extensive efforts to conceal their unlawful conduct. *Id.* ¶¶ 105-110.

Alliant's raid of Lockton in this case followed Alliant's well-established pattern to a tee. This raid bears many of Alliant's signature hallmarks, including but not limited to: (1) months of planning and coordination, (2) a mass resignation planned for a time when Lockton's senior leadership would be occupied, (3) misappropriation of trade secrets and confidential information, (4) solicitation of customers, often through intermediaries to conceal the solicitation; (5) the immediate and mass transition of customer accounts from Lockton to Alliant, (6) the filing of preemptive litigation in California by the resigning personnel, and (7) a façade of sham compliance measures and other efforts to conceal the misconduct. *See, e.g.*, *id.* ¶¶ 115-132.

The most recent raid is not the first time Lockton has been victimized by Alliant's leveraged hire strategy. A similar raid of Lockton in 2019 resulted in the Delaware Chancery Court enjoining Alliant's unlawful conduct. In a comprehensive, 57-page opinion, the court found that Alliant had launched a "full-court press" to solicit competitors' clients through "coordinate[d]" sweeping raids. *See Mountain W. Series of Lockton Cos., LLC v. Alliant Ins. Servs.*, No. 2019-0226-JTL, 2019 WL 2536104, at *1 (Del. Ch. 2020) (unpublished). The court found that Alliant was a "repeat player" that engaged in "secretive and underhanded behavior in violation of contractual obligations and legal requirements" and attempted to "mask their activities under a façade of compliance measures and through misleading representations and averments." *See id.* at *22, *25. The court also found that Alliant had directed the destruction of documents and electronic images to conceal its unlawful conduct. *See id.* at *20 ("Alliant also took independently wrongful steps such as

directing [a departing Lockton producer] to destroy evidence….”). It found that “Alliant engaged in extensive efforts to avoid creating an evidentiary record of its activities, which crossed the line on important occasions into the actual destruction of evidence.” *See id.* at *17.

### III.    Stone Point’s Relationship to Alliant and Involvement in the Leveraged Hire Strategy.

In 2015, Stone Point became the largest shareholder in Alliant.[2] Over the last decade, Stone Point has continuously held as many as three seats on Alliant’s Board of Directors. Currently, Stone Point principals James D. Carey and James R. Matthews hold two of the eight seats on Alliant’s Board.[3] Stone Point has been paid millions of dollars to “provide management services to Alliant”[4] and states that “[c]lose collaboration across the Alliant and Stone Point teams facilitated a seamless execution on recent material transaction” for Alliant.[5] Alliant’s Executive Chairman, Tom Corbett, has emphasized Stone Point’s essential resources and support for Alliant’s growth strategy: “The resources and support Stone Point has provided have been essential to Alliant’s success as we have actively grown our organization….”[6]

On information and belief, Stone Point developed and helped implement Alliant’s leveraged hire strategy. Compl. ¶ 96. Moreover, Stone Point’s investments in Alliant are critical to several aspects of the strategy. For example, as described above, Alliant offers inflated compensation packages—including equity in the company—to induce contractual breaches by

---

[2] *See Alliant Insurance Services Announces Significant Investment from Stone Point Capital*, Business Wire (June 23, 2015), *available at* https://www.businesswire.com/news/home/20150623005884/en/Alliant-Insurance-Services-Announces-Significant-Investment-from-Stone-Point-Capital (last visited Mar. 6, 2025).
[3] *See* https://alliant.com/about/leadership/ (last visited Mar. 6, 2025).
[4] *See* Alliant Proposal to Provide Insurance Services to the City of Costa Mesa, at p. 34 (Feb. 15, 2017), *available* at http://ftp.costamesaca.gov/costamesaca/council/agenda/2017/2017-08-01/CC-7-Attach-1.pdf (last visited March 6, 2025) (noting that in 2015, Alliant paid Stone Point and another private equity firm approximately $3.9 million in management fees).
[5] *See* https://www.stonepoint.com/company/alliant (last visited Mar. 6, 2025).
[6] *See* https://www.stonepoint.com/company/alliant (last visited Mar. 6, 2025).

producers. *Id.* ¶ 98. Stone Point's involvement is key because it infuses Alliant with the cash necessary to make these offers. *Id.* ¶ 102. Moreover, on information and belief, producers are promised that Stone Point will sell Alliant at a large profit in the future, at which point the value of the producers' equity shares in Alliant will skyrocket. *Id.* ¶ 98.

Stone Point's investment is also key because Alliant's leveraged hire strategy is implemented with litigation in mind. *Id.* ¶¶ 111-112. Well-funded, Alliant strategizes to outlast and "outspend" its litigation opponents, forcing a settlement amount that is lower than the revenue generated from the raid, thus ensuring the leveraged hire strategy remains profitable. *Id.* Stone Point's investment makes this litigation strategy possible.

## IV.    **Lockton's Subpoena and Stone Point's Response.**

Given the importance of the leveraged hire strategy to Lockton's claims in the Missouri Action and Stone Point's outsized role in designing and funding that strategy, Lockton has good reason to believe that Stone Point possesses documents relevant to Lockton's claims in the Missouri Action. Accordingly, Lockton issued a subpoena to Stone Point on May 3, 2024. *See* Falconer Decl., Ex. B, Subpoena to Stone Point. Broadly speaking, the subpoena seeks documents and communications related to three separate topics.

*First,* three requests for production ("RFPs") in the subpoena seek documents related to the recruitment, solicitation, and hiring of the six Individual Defendants and the more than a dozen other Lockton personnel who left Lockton and joined Alliant (RFP 1-2, 21).[7] This is the only

---

[7] Those three requests seek the following documents:
- RFP 1: "All Documents and Communications related to or referencing the Individual Defendants or the Resigning Lockton Personnel." *See* Ex. B.
- RFP 2: "All Documents and Communications concerning Alliant's solicitation, recruiting, targeting, or hiring of the Individual Defendants or the Resigning Lockton Personnel." *Id.*
- RFP 21: "All Documents and Communications involving Nicolas D. Zerbib, James R. Matthews, James Carey, Matt Crimmins, Stephen Levey, or Alex Sarnoff relating to Alliant's recruiting or

portion of the subpoena that Stone Point has responded to. And for these three narrow requests, Stone Point has refused to search for or produce anything except documents that contain the names of the Individual Defendants. *See* Falconer Decl., Ex. C, Stone Point's Responses and Objections to Subpoena, at Resp. to RFP 1-2, 21. (Put differently, these requests sought documents related to 25 former Lockton personnel other than the Individual Defendants, and Stone Point refused to produce documents related to any of them.) Stone Point's production in response to these three RFPs comprises a whopping 20 irrelevant documents, Google Alerts and non-substantive emails that Stone Point retrieved by using each Individual Defendant's full name as a search term. According to Stone Point, its obligation to respond to Lockton's subpoena should end there.[8]

**Second**, the subpoena seeks documents related to Alliant's leveraged hire strategy. These include six RFPs seeking documents related to the leveraged hire strategy in general—including financial analyses, risk analyses, growth strategies, plans, and other materials[9]—and two RFPs

---

hiring of any of the Individual Defendants, Resigning Lockton Personnel, or any other Series member." *Id.*

[8] Although Stone Point's response even to these three requests is plainly deficient, in an effort to narrow the dispute and conserve the Court's and the parties' resources, Lockton is not pursuing an additional production of documents specifically related to the Individual Defendants or Resigning Lockton Personnel at this time. Instead, this Motion focuses on Stone Point's refusal to produce (1) documents related to the leveraged hire strategy, (2) documents related to Lockton's confidential information, and (3) a privilege log.

[9] Those six requests seek the following documents:

- RFP 3: "All Documents and Communications exchanged between any member of Alliant's Executive Management Team and/or Alliant's Board of Directors, on the one hand, and You, on the other hand, relating to or referencing Alliant's Leveraged Hire Strategy." *See* Ex. B.
- RFP 4: "All Documents and Communications evidencing information exchanged between any member of Alliant's Executive Management Team and/or Alliant's Board of Directors, on the one hand, and You, on the other hand, related to or referencing Alliant's growth strategy, including but not limited to, its Leveraged Hire Strategy." *Id.*
- RFP 5: "All Documents, including financial analyses, that reflect or relate to the financial impact, consequences, benefits, and/or risks to You or Alliant arising out of or concerning Alliant's Leveraged Hire Strategy." *Id.*
- RFP 10: "All Documents and Communications related to, referencing, or evidencing any meeting of Alliant's Board of Directors at which Alliant's growth strategies—including, but not limited to, its Leveraged Hire Strategy, or growth goals, targets, or projections—were discussed. This Request includes but is not limited to all agendas, meeting minutes, presentations, slide decks, board books, board packets, and audio and/or video recordings." *Id.*

specific to Alliant's deployment of its leveraged hire strategy against Lockton.[10] Stone Point has stonewalled these eight requests entirely. Not only has Stone Point refused to produce even a single document in response to these requests—*it has refused to even run Lockton's proposed searches* to identify the universe of potentially responsive documents so that the parties can have an informed, data-driven discussion about issues like custodians, burden, and scope.

**Finally**, Lockton's subpoena also includes a single RFP seeking documents related to Alliant's effort to misappropriate confidential information from Lockton.[11] For this request, too, Stone Point has refused to search for, let alone produce, any documents.

Lockton has exchanged extensive correspondence and met and conferred with Stone Point, but the parties are at an impasse. *See* Falconer Decl., Ex. D, Meet and Confer Correspondence. Stone Point's refusal to produce the documents that are at the center of Lockton's claims against Alliant is unjustified. For the reasons set forth below, the Court should compel Stone Point to produce: (1) documents and communications related to Alliant's leveraged hire strategy, (2) documents related to Lockton's confidential information, and (3) a privilege log reflecting all documents withheld on the basis of privilege.

---

- RFP 19: "All Documents and Communications between You and Alliant concerning any financing You have provided to Alliant, whether through equity, debt, or other means, related to Alliant's Leveraged Hire Strategy." *Id.*
- RFP 26: "Documents sufficient to show any financial models, plans, projections, or other analysis You have conducted related to litigation costs incurred by Alliant, including without limitation any financial models, plans, or projections, or other analysis discussing the impact of litigation costs on Alliant's profitability." *Id.*

[10] Those two requests seek the following documents:

- RFP 6: "All Documents, including financial analyses, that reflect or relate to the financial impact, consequences, benefits, and/or risks to You or Alliant arising out of the hiring of an individual or team of individuals from Lockton, including but not limited to assessments of the actual or potential profitability of such individuals or teams." *See* Ex. B.
- RFP 13: "All Documents and Communications regarding Your or Alliant's plans to deploy its Leveraged Hire Strategy against Lockton." *Id.*

[11] RFP 22: "All Documents and Communications related to Lockton's Confidential Information." *See* Ex. B.

11

## LEGAL STANDARD

Subpoenas issued under Rule 45 are subject to the relevance and proportionality standards of Rule 26. *See During v. City Univ. of New York*, 2006 WL 2192843, at *2, *4 (S.D.N.Y. Aug. 1, 2006). Thus, a party may obtain via a Rule 45 subpoena "discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Rule 26 relevance is an "obviously broad rule" that is "liberally construed." *Daval Steel Prods, a Div. of Francosteel Corp. v. M/V Fakredine*, 951 F.2d 1357, 1367 (2d Cir. 1991). In assessing proportionality, courts consider "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).

## ARGUMENT

### I.    The Court Should Compel Production of Documents Related to the Leveraged Hire Strategy.

#### A.  Documents Related to Alliant's Leveraged Hire Strategy Are Relevant.

Documents related to Alliant's leveraged hire strategy are critical to Lockton's claims against Alliant in the Missouri Action, regardless of whether they specifically reference Lockton or the Individual Defendants. Lockton has asserted claims against Alliant for tortious interference, misappropriation of trade secrets, and aiding and abetting, each of which requires Lockton to establish Alliant's knowledge and/or intent as an element of the claim. In other words, even where Lockton proves the Individual Defendants violated their contractual and common law obligations to Lockton, Alliant can defend against the claims by arguing that it did not know about those violations or intend for them to occur. Indeed, Alliant routinely emphasizes its sham compliance measures to argue that it takes steps to guard against new hires committing these types of

violations, and so if any such violations occurred, they were accidental and contrary to Alliant's intent. *See* Compl. ¶¶ 106-09; *Mountain W. Series of Lockton Cos. LLC*, 2019 WL 2536104, at *22 (recognizing that Alliant's "façade of compliance measures" is a key component of its unlawful strategy). Lockton is entitled to rebut these arguments.

Evidence demonstrating that the conduct that occurred in this raid was part of a premeditated, concerted plan bears directly on Alliant's knowledge and the intentionality of its actions. This evidence will help Lockton establish, among other things, that the raid was consistent with Alliant's pattern and practice and modus operandi, and that the unlawful conduct that occurred here was no mistake. *See, e.g.*, *id.* at *17 (considering evidence of "Alliant's intent, the presence of an overarching plan, and the absence of a mistake or accident" in granting preliminary injunction on Lockton's tortious interference claim under Missouri law).

The financial analyses, models, plans, and projections sought by the subpoena are particularly important in this regard. As alleged in the complaint, Alliant engages in the leveraged hire strategy only after careful analysis determining that "the amount of money, information, and receivables it could steal from its competitors and then turn around and resell to the highest bidder would outweigh the litigation costs, including settlements and judgments, for doing so." Compl. ¶ 97. The mere existence of these analyses—including expected litigation costs—is probative of Alliant's intent. *See Mountain W. Series of Lockton Cos., LLC*, 2019 WL 2536104, at *25 ("Alliant is a sophisticated entity and repeat player. It raided Lockton knowing about the risks, and it prepared for litigation from the outset.").

In addition, this evidence will support Lockton's conspiracy claim by showing that Alliant and the resigning personnel had a meeting of the minds, and by establishing the object and course of action to which they agreed as well as the overt acts they took to further the conspiracy. *Mackey*

*v. Mackey*, 914 S.W.2d 48, 50 (Mo. Ct. App. 1996). This evidence is also directly relevant to Lockton's claims for punitive damages.

It is for all of these reasons that at least one court has rejected the precise arguments asserted by Stone Point and compelled Stone Point to produce ***the very same documents Lockton seeks here***. *See Arthur J. Gallagher & Co., In re: Subpoena to Stone Point Capital, LLC*, No. FSTCV226055961S, 2022 WL 3754816 (Conn. Super. Ct. Aug. 30, 2022) (unpublished). In that case, Gallagher, another competitor in the industry, sued Alliant after Alliant executed one of its patented raids of Gallagher's offices in Texas. *See id.* at *1 (Gallagher alleged that Alliant "induc[ed] former Gallagher employees to resign, without required notice, while allegedly inducing if not actively encouraging coordinated multiple violations of contract obligations/prohibitions such as non-compete or non-solicitation provisions"). Like here, Stone Point attempted to avoid discovery into Alliant's leveraged hire strategy, arguing that discovery should be "directly connected to the Texas litigation." *Id.* The court rejected Stone Point's argument and instead accepted Gallagher's position "that because the Texas litigation is but one instance of a pattern of conduct, involving application of a claimed business strategy that applies not only to the specifics of the Texas litigation but more generally …, it should be allowed to make inquiries related to records relating to that business strategy without requirement of specific reference/linkage to the Texas litigation." *Id.* The court concluded that "discovery should be allowed to go forward" on the topics of information sought by Gallagher, even where the documents sought "might well have no specific mention of terms providing a direct linkage to the Texas litigation." *Id.* at *2.

In sum, Lockton alleges that Alliant's raid giving rise to the Missouri Action was not an isolated incident, but rather was the latest execution of a carefully crafted pattern and practice that

Alliant has executed across the country for decades. Lockton is entitled to discovery of the documents related to that pattern and practice. The documents are relevant for a whole host of reasons and are critical to proving that Alliant acted knowingly and intentionally in its latest raid.

**B. Any Burden Imposed on Stone Point is Proportional to the Needs of the Case.**

To aid Stone Point in identifying responsive documents, Lockton proposed three tailored searches to run across six custodians:

- Alliant w/20 ((leverage* or lateral) w/3 hire*)
- (playbook or "play book" or strategy or plan or blueprint) w/10 ((leverage* or lateral) w/3 hire*)
- "LH" w/15 (recruit* or grow* or candidate* or status or strategy or blueprint or plan* or revenue* or expense* or cost*)

*See* Ex. D, July 23, 2024 Correspondence, at p. 3.[12] There is no reason to believe these three narrow searches would yield an extraordinary number of hits. Indeed, it is telling that Stone Point has apparently ***refused to even run the searches***, and nowhere in any of its extensive correspondence has Stone Point asserted that the volume of hits would be prohibitive.

Moreover, even if there is some burden involved in producing these documents, it is proportionate to the needs of the case. This is a significant lawsuit in which Lockton seeks tens of millions of dollars in damages, and the documents sought are critical to Lockton's claims. Thus, the burden associated with the subpoena cannot rightly be characterized as ***undue***.

It is also important to note that Stone Point is not an ordinary third-party. It is the largest investor in the main defendant in the Missouri Action and holds multiple seats on its Board of Directors. Stone Point, therefore, has a direct financial interest in the outcome of the Missouri

---

[12] Lockton has also proposed that Stone Point could manually identify documents responsive to Document Request Nos. 5-7, 15-16, 19, and 26, which relate to Stone Point's financing as well as modeling, analyses, and assessments related to the leveraged hire strategy. Stone Point has refused to do so.

Action. Stone Point is also a large, sophisticated private equity fund with ample resources. It is more than capable of running three narrow searches and producing the responsive documents.

Nonetheless, throughout the meet and confer process, Stone Point has repeatedly taken the position that it should not have to undertake *any* burden associated with producing documents related to the leveraged hire strategy because Lockton should obtain those documents directly from Alliant. *See, e.g.*, Ex. D, June 10, 2024 Correspondence, at p. 3 (stating Stone Point is "amenable to meeting and conferring regarding proportionate, non-burdensome requests for such discovery," but only "[i]f Lockton first attempts to, but cannot, obtain such discovery from Alliant for reasons other than Alliant's successful objections (*e.g.*, unavailability)"). Neither the premise of Stone Point's argument (that Alliant possesses all of the documents sought), nor the conclusion (that Alliant's possession of the documents would justify Stone Point's refusal to comply with the subpoena), is correct.

*First*, many of Lockton's requests seek documents that would be exclusively in Stone Point's possession. For example, RFP 10 seeks documents related to certain meetings of Alliant's Board of Directors. Responsive documents could (and almost certainly would) include communications between Stone Point employees who sit on Alliant's Board, as well as communications between those Board members and other Stone Point employees. Because these Board members communicate using a Stone Point email address (not an Alliant email address), Alliant would not be in possession of those communications. Similarly, RFPs 5-6 seek financial analyses of the leveraged hire strategy. Such analyses may be different or in addition to the analyses in Alliant's possession. RFP 13 seeks documents and communications related to any plans to deploy the leveraged hire strategy against Lockton. Again, Stone Point's internal communications and documents exchanged via Stone Point email accounts would not necessarily be in Alliant's

possession. These are just a few illustrative examples of responsive documents that Stone Point would possess.

*Second,* even in instances where Alliant also would possess the documents sought, that is not a basis to refuse production. In fact, even where requests "may overlap significantly with discovery from [the defendant], the potential for duplicative discovery does not by itself make a subpoena improper." *Frazier v. Morgan Stanley & Co.*, *LLC*, 2021 WL 2709250, at *5 (S.D.N.Y. July 1, 2021). Some duplication can be expected, and it is neither possible nor necessary to craft searches that would somehow extricate documents that Alliant also happens to possess. Moreover, seeking these critical documents from Stone Point allows Lockton to test the completeness of Alliant's document production—a legitimate, well-established reason to pursue third-party discovery. As explained in *Amphenol Corp. v. Fractus, S.A.*, it is "not unreasonable" to seek relevant information from a third-party "even if some of it may prove duplicative" because "it is appropriate for [a plaintiff] to 'test the accuracy and completeness of the defendants' discovery responses and their denials that additional information exists.'" 2019 WL 2521300, at *11 (S.D.N.Y. June 19, 2019) (refusing to quash subpoena where third-party argued the information was available from defendants). For this reason, courts routinely allow third-party discovery over objection that it may be duplicative. *See, e.g.*, *MG Freesites Ltd. v. Scorpcast, LLC*, 2023 WL 2822272, at *3 (S.D.N.Y. Apr. 7, 2023) (allowing third-party document request that was "seeking to test the accuracy of [party] discovery"); *Hamilton Partners, L.P. v. Highland Cap. Mgmt., L.P.*, 2016 WL 612233, at *6 (Del. Ch. Feb. 2, 2016) (noting that objections to discovery as duplicative are usually denied and holding that the "risk that Non-Parties responding to the same discovery requests will produce the same documents as each other and [the defendant] was outweighed by two competing considerations": (1) that it is reasonable to suspect that "different individuals will

produce different documents;" and, (2) that production from various individuals "might allow [a party] to test the truth, accuracy and completeness of extant and forthcoming production."); *Saller v. QVC, Inc.*, 2016 WL 8716270, at *6 (E.D. Pa. June 24, 2016) (a party "is entitled to serve third-party subpoenas to test the veracity of the opposing party's assertion that they have produced all documents they were required to produce") (cleaned up); *Kasper v. AAC Holdings, Inc.*, 2017 WL 6353294, at *7 (M.D. Tenn. Oct. 6, 2017) ("Neither is the Court convinced that Avondale may avoid the request simply because Plaintiffs have sought the same documents from Defendants. … Given the extreme importance of the element of scienter to Plaintiffs case, any such risk of duplicate production is outweighed by the likely benefit of this discovery.").

The need to test the completeness of Alliant's production is especially acute given Alliant's documented history of discovery abuses, including destroying and concealing evidence of its raids against Lockton. Specifically, the Delaware Chancery Court made the following findings after an evidentiary hearing concerning Alliant's 2019 raid of Lockton:

- "Alliant engaged in extensive efforts to avoid creating an evidentiary record of its activities, which crossed the line on important occasions into the actual destruction of evidence."

- Alliant's outside counsel, Morgan Lewis & Bockius LLP, instructed Alliant executive Peter Arkley to tell departing Lockton producer Charles McDaniel to destroy an email evidencing McDaniel's wrongdoing, recognizing that other copies of the email may exist, but calling the destruction of evidence "a start."

- "Consistent with the lawyer's instruction and attitude, Arkley deleted texts from McDaniel during the days leading up to the litigation."

- "Along similarly disturbing lines, [departing Lockton producer] Jain wiped his Lockton-issued iPhone and iPad on the day he resigned."

*Mountain W. Series of Lockton Cos. LLC*, 2019 WL 2536104, at *17. Accordingly, while testing the completeness of any defendant's production is a legitimate purpose of third-party discovery, testing the completeness of **Alliant's** production is particularly important. This is an independent

18

basis to allow the discovery to go forward, even if Lockton can also obtain some of the documents at issue from Alliant.

**II.    The Court Should Compel Stone Point to Produce Documents Related to Lockton's Confidential Information.**

RFP 22 seeks documents related to Lockton's confidential information. Stone Point has refused to even search for such documents, apparently because it does not believe it possesses them. *See* Ex. D, October 17, 2024 Correspondence, at p. 5 ("Stone Point does not anticipate that it would possess any such documents.")*; id.*, August 8, 2024 Correspondence, at p. 5 ("If Lockton is able to identify specific documents that it believes are confidential Lockton documents, and if Lockton can articulate a reasonable basis for believing that Stone Point might have any such document(s) in its possession, custody, or control, Stone Point will consider in good faith a request to search for those specific documents.").

This should not be a controversial request. Lockton alleges in the Missouri Action that Alliant is actively engaged in a scheme—financed and facilitated by Stone Point—that involves coordinated efforts to misappropriate and use Lockton's confidential information. Lockton has every reason to believe that Stone Point is in possession of documents related to those efforts.

To assist Stone Point in identifying responsive documents, Lockton proposed a single, narrow search. Ex. D, July 23, 2024 Correspondence, at p. 4. Once again, Stone Point has ***refused to even run the search***, so Lockton cannot meaningfully assess the burden imposed by the request, but there is no reason to believe it would be substantial. On the flipside, Stone Point's possession of documents related to Alliant's effort to misappropriate confidential information from Lockton have significant probative value. Accordingly, the Court should order Stone Point to run Lockton's proposed search and produce responsive documents.

### III.      **The Court Should Order Stone Point to Produce a Complete Privilege Log.**

If Stone Point withholds any documents from production on the basis of privilege, it should produce a privilege log. Stone Point takes a different view. Its position is that "to the extent that Stone Point's searches yield documents that were created by Alliant, sent by Alliant personnel to Stone Point appointees to Alliant's board of directors in their capacity as Alliant directors and, on the face of the document itself, Alliant has asserted the document is subject to the attorney-client privilege and/or attorney work product protections, Stone Point will not make a responsiveness determination, produce a privilege log, or produce the document." *See* Ex. D, August 8, 2024 Correspondence, at p. 3. In other words, if Stone Point locates responsive documents created by Alliant that contain privilege branding, Stone Point will neither log those documents nor produce them.

Stone Point's position is wholly improper. Rule 45 requires third parties to produce a privilege log for withheld documents. Fed. R. Civ. P. 45(e)(2)(A); *In re Chevron Corp.*, 749 F. Supp. 2d 170, 180 (S.D.N.Y. 2010) ("Both Fed. R. Civ. P. 26(b)(5) and 45(c) and S.D.N.Y. CIV. R. 26.2 require the submission of a privilege log where a person served with a document request or subpoena objects to the production of requested documents on the ground of privilege."). If allowed, Stone Point's approach would result in the existence of responsive documents being concealed from Lockton. While this would be problematic in any case, it would be particularly problematic here given Alliant's documented history of "attempting to invoke privilege expansively to hide problematic documents." *Mountain W. Series of Lockton Cos. LLC*, 2019 WL 2536104, at *10 n.6.

If Stone Point withholds any documents on the basis of privilege, it should identify those documents in a log so that Lockton can appropriately assess and, if necessary, challenge the privilege assertion.

## **CONCLUSION**

For the foregoing reasons, Lockton respectfully requests the Court enter an Order granting the Motion to Compel, awarding Lockton its attorneys' fees and costs, and ordering such further relief as the Court deems just and proper.

Dated:    March 13, 2025                              Respectfully submitted,
          New York, New York

                                                     GIBSON, DUNN & CRUTCHER LLP

                                                     By:  */s/ Lauren Goldman*
                                                          Lauren Goldman
                                                          200 Park Avenue
                                                          New York, NY 10166-0193
                                                          Telephone: (212) 351-4000
                                                          LGoldman@gibsondunn.com

                                                          Russell H. Falconer (*pro hac vice forthcoming*)
                                                          2001 Ross Avenue, Suite 2100
                                                          Dallas, TX  75201
                                                          Telephone:  (214) 698-3170
                                                          Email:  RFalconer@gibsondunn.com

                                                          -and-

                                                     RILEY SAFER HOMES & CANCILA

                                                          Eli Litoff (*pro hac vice forthcoming*)
                                                          One South Dearborn St., Suite 2200
                                                          Chicago, IL 60603
                                                          (312) 471-8780 (telephone)
                                                          elitoff@rshc-law.com
                                                          *Attorneys for Plaintiff Lockton Partners, LLC*

21

**ATTORNEY CERTIFICATION PURSUANT TO LOCAL RULE 7.1(c)**

I, Lauren Goldman, hereby certify that the attached document complies with the word count limit set for in Local Rule 7.1(c), as it contains 7,279 words, excluding the caption, table of contents, table of authorities, and signature blocks. In preparing this certification, I have relied on the word count of the word-processing system used to prepare the attached document.


Dated:   March 13, 2025
         New York, New York


                              */s/ Lauren Goldman*
                              Lauren Goldman